# 23-1071-cv

## United States Court of Appeals

*for the*

## Second Circuit

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

— v. —

JAMES DAVID O'BRIEN,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

# BRIEF AND SPECIAL APPENDIX
# FOR DEFENDANT-APPELLANT

JOHN M. HANAMIRIAN
HANAMIRIAN LAW FIRM, PC
*Attorneys for Defendant-Appellant*
40 East Main Street
Moorestown, New Jersey 08057
(856) 793-9092

CP COUNSEL PRESS    (800) 4-APPEAL • (325139)

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................... iii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW .............................1

CONCISE STATEMENT OF THE CASE ..............................................2

1.  Relevant Facts ............................................................2

2.  Procedural History.......................................................5

3.  The Rulings Presented for Review...............................8

SUMMARY OF THE ARGUMENT ..................................................9

STANDARD OF REVIEW ................................................................11

ARGUMENT ...................................................................................11

I.    The District Court erred when it ordered disgorgement without making an independent finding that O'Brien was properly subject to disgorgement in the first instance pursuant to the express language of the Consent Judgment..................11

a.   The was no proof that the Appellant's gains, ill-gotten or not, represented a reasonable approximation of the amount ordered to be disgorged. ..................18

b.   The District Court erred by including the Vanguard trading in the calculation of disgorgement..................................................................22

c.   The District Court erred in failing to deduct the payment of taxes on the amount purportedly "ill-gained".........................................................23

II.   The District Court's finding that O'Brien acted with scienter is unsupported by the Record, thus the imposition of a third-tier penalty is an abuse of discretion. ..........................................................................................25

CONCLUSION ...................................................................................29

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

<u>Charles C. Liu, et al. v. Securities and Exchange Commission</u>, 591 U.S. ___

(2020). ............................................................................................................19

<u>In re Sims</u>, 534 F.3d 117, 132 (2d Cir. 2008) ...........................................................14

<u>Liu v. Sec. & Exch. Comm'n</u>, 140 S. Ct. 1936, 1942-43, 207 L. Ed. 2d 401 (2020)

............................................................................................ 20, 23, 24, 29

<u>Mertens v. Hewitt Associates</u>, 508 U.S. 248, (1993) ...............................................20

<u>Providence Rubber Co. v. Goodyear</u>, 76 U.S. 788, 804, 19 L. Ed. 566 (1869) ......25

<u>SEC v. Ahmed, et al.</u> (21-1686) (2023) ...................................................................29

<u>SEC v. Davis</u>, 2022 U.S. Dist. Lexis 142073 ..........................................................24

<u>SEC v. First Jersey Sec.</u>, Inc, 101 F.3d 1450, 1474-76 (2d Cir. 1996) ........... 14, 16

<u>SEC v. Govil</u>, No. 22-1658 (2023) .................................................................. 14, 29

<u>SEC v. Razmilovic,</u> 738 F.3d 14, 32 (2d Cir. 2013)...............................................14

<u>SEC v. Sourlis</u>, 851 F.3d 139, 146 (2d. Cir. 2016)..................................................14

<u>Tilghman v. Proctor</u>, 125 U.S. 136, 145-46, 8 S. Ct. 894, 31 L. Ed. 664, 1877 Dec.

Comm'r Pat. 286 (1888 .........................................................................24

**Rules**

15 U.S.C. § 78aa ...................................................................................1

15 U.S.C. 77(d)(2)(A) ..........................................................................28

15 U.S.C. 77t(d) ...................................................................................28

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1331 ....................................................................................1

Restatement (3d) of Restitution & Unjust Enrichment § 51(4)-(5) (2011) .............26

Securities Exchange Act of 1934 ...........................................................1

**Other Authorities**

Dodd Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1844 ....20

Restatement (3d) of Restitution & Unjust Enrichment § 51(4)-(5) (2011) .............24

Securities Exchange Act of 1934 § 21, 15 U.S.C.A. § 78u(d)(7) ...........................11

## **PRELIMINARY STATEMENT**

Appellant James David O'Brien ("O'Brien" or "Appellant") appeals from a Decision and Order of the United States District Court for the Southern District of New York (SPA1) entered on May 25, 2023, granting the Securities and Exchange Commission's Motion ("the Commission") for Monetary Relief ("the Order") (SPA42), and the Order entered on June 2, 2023, reducing the Court's decision to Final Judgment ("Final Judgment"). (SPA43).

## **JURISDICTIONAL STATEMENT**

The District Court had subject matter jurisdiction pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa and 28 U.S.C. § 1331. This Court has jurisdiction of this Final Judgment pursuant to 28 U.S.C. § 1291. O'Brien filed a timely Notice of Appeal on August 1, 2023. (A1849).

## **STATEMENT OF THE ISSUE PRESENTED FOR REVIEW**

Did the District Court err in ordering disgorgement of O'Brien's purported "ill-gotten" gains, resultant interest, and a third-tier civil penalty without making an independent finding in the first instance that O'Brien's stock market trading strategy

was properly subject to disgorgement pursuant to the express terms of a consent judgment?

## CONCISE STATEMENT OF THE CASE

### 1. Relevant Facts

O'Brien worked on Wall Street for more than twenty years and had a long history of trading as a professional market-maker prior to the Securities and Exchange Commission investigation of O'Brien that began in 2015. That investigation acted as a precursor to the filing of the Complaint in this matter. O'Brien's role as a market-maker on Wall Street consisted of doing precisely the type of stock trading activity that the Commission accused him of engaging in improperly in this case. To the contrary, however, O'Brien violated no laws as a market maker on Wall Street and no violations of any securities laws were ever alleged. Despite the inflammatory language used by the Commission throughout the Complaint, no effort was made to curb or halt O'Brien's trading, even after the Complaint was filed. Rather, it was O'Brien himself who agreed to resolve the injunctive relief component of the litigation in February 2023 through the negotiation and execution of a Consent Order. (A1601).

The Complaint (A12) alleged that O'Brien violated various securities laws, yet the Appendices attached to the Commission's Complaint (A31; A34) show only

that O'Brien executed two (2) sets of stock trades, each during the course of one day in 2016 and in 2019, respectively. (A12; A31). Those two (2) examples, according to the Commission, are purportedly indicative of a grander fraudulent scheme the Commission coined as "coordinated trading", (A12), in which he allegedly intended to manipulate the stock market for his own gain and to the detriment of other traders despite never having heard that term and with no proof whatsoever that anyone was harmed by his methodology. (A12). The Complaint is predicated on the notion that if the trading pattern in those two stocks is problematic, then all of O'Brien's trading must be problematic despite failing to analyze each trading event. (A12). As an example of the overreaching result in this case, on January 9, 2014, the New York Stock Exchange charged Citadel Securities LLC with engaging in wash sales 502,243 times using its computer algorithms. A wash sale is where the buyer and the seller are the same entity and no change in beneficial ownership occurs. Citadel Securities LLC suffered the consequence of only a $115,000 fine for 502,243 violations. The Commission analyzed O'Brien's trading pattern over the course of five years, then developed the term "coordinated trading" (A16) to capture what they believed his strategy to be, determined it to be unlawful, then accused him of knowing engaging in the conduct then just defined.

The two (2) Appendices that delineate O'Brien's buy and sell orders in two symbols occurred on two separate days, two- and one-half years apart. (A31). One

from 2016 and one from nearly a year after he was aware he was being investigated and had proffered. Appendix A focused on O'Brien's trading of Silicon Laboratories Inc., on September 29, 2016, under the symbol "SLAB". (A31). Appendix B focused on O'Brien's trading of Shopify Inc., on April 2, 2019, under the symbol "SHOP". (A34). O'Brien testified by way of sworn affidavit on April 6, 2023, explaining that the Commission examples in SHOP and SLAB trading do not support the Commission's allegations that he engaged in unlawful trading, and those examples proved to him how difficult it would be to have lay people understand the intricacies of his price discovery trading methodology. (A1730). O'Brien's gross proceeds from those two trading events, however, totaled only $10,075. (A, 31; A34; A341; A363). No legal authority was offered for the proposition that such a sampling was sufficient to find a violation of the law for the entirety of O'Brien's trading over many, many years and no other proofs were provided in support of the allegations, or the relief sought in the Complaint. Nonetheless, the District Court's Order adopted the Commission's expert report findings and required O'Brien to disgorge an amount far in excess of that which he ever received from his trading and coupled that award with a Tier Three Civil Penalty five times the amount requested by the Commission, and, of course, inconsistent with his actual trading net profits. (SPA1-43).

2. **Procedural History**

The Commission began its investigation of O'Brien in 2015 and ultimately filed its Complaint in November 2021. (A12). In 2018 and 2019, the Commission sought to investigate O'Brien under the criminal statutes related to securities trading. The Commission issued a subpoena to O'Brien in May 2018. O'Brien responded by offering a proffer and executing a proffer agreement with each of the Commission (A1120) and the United States Attorneys' Office for the District of New Jersey. O'Brien then participated in a proffer session with both of those governmental units wherein he described with particularity his trading activity and methodology. The Commission continued their investigation and a year later, in May 2019, breached the proffer agreement with O'Brien and issued another identical subpoena. (A1124). Ultimately, O'Brien complied with the second subpoena, and still no criminal charges were filed. The Commission used the information obtained in the proffer session with O'Brien, however, to form the basis for the Complaint. The Commission then proceeded to pursue discovery in the civil case and four (4) years later, in another sleight of hand, alleged that despite all efforts to comply with his discovery obligations, O'Brien was deficient, misrepresenting to the District Court the facts surrounding his efforts. (A12). The Court then ordered O'Brien to turn over his physical computer hard drive and mobile phones within twenty-four (24) hours. (A62). O'Brien complied and despite reviewing all of the data on O'Brien's

5

mobile phones, computer and all of O'Brien's trading records, email and all other communications related to stock trading (A64), no amended pleadings were filed. O'Brien believes that the Commission was searching for an accomplice trader, someone O'Brien must have been colluding with, as they built their case trying to fit it to a similar prosecution effort involving organized crime. The problem with that approach, however, is that O'Brien was not engaged with any others in his price discovery trading strategy.

The Commission filed its Complaint in November 2021. O'Brien's Answer was filed on February 4, 2022. On November 3, 2022, O'Brien filed a motion for summary judgment. On November 4, the Commission filed its own motion for summary judgment. Both motions were denied on January 6, 2023. One month later, the Parties began a process with Magistrate Judge, Stewart Aaron, (A1580), which culminated in the signing of a Consent Judgment on February 3, 2023. (A1585). The Consent Judgment, among other things, permitted O'Brien to testify on his own behalf and be subject to cross-examination, which occurred on May 19, 2023. (A1760).

The Consent Order provided in relevant part:

> *The Securities and Exchange Commission having filed a Complaint and Defendant James David O'Brien ("Defendant") having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to the entry of*

6

*this Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction as other provided herein in paragraphs IV and V); waived findings of fact and conclusions of law; and waived any right to appeal from this Judgment:*

*IV.*

*IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED that upon motion of the Commission, **the Court shall determine whether it is appropriate to order disgorgement** of ill-gotten gains and/or a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, if so, the amount(s) of the disgorgement and/or civil penalty. If disgorgement is ordered, Defendant shall pay prejudgment interest thereon, calculated from June 1, 2021, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). In connection with the Commissions motion for disgorgement, and/or civil penalties, for an t any hearing held on such a motion: (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of the Consent or this Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court except with respect to the quantum of disgorgement, i.e. net profits; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, the sworn testimony of the Defendant before the Court (subject to cross-examination by the Plaintiff) and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.*

(A1591).

The District Court issued its Opinion and Order on May 25, 2023.  (SPA1; SPA42). O'Brien filed his Opposition to the Opinion and Order on June 2, 2023. (A1844). The District Court's Final Judgment was filed on June 2, 2023. (SPA43). The Final Judgment forms the basis of this Appeal.

3.  **The Rulings Presented for Review**

a.  The District Court erroneously characterized O'Brien's profits from trading as "ill-gotten", despite having failed to analyze the underlying trading activity which formed the basis of the Complaint;

b.  The District Court Ordered O'Brien to disgorge those profits in an amount far in excess of that which was actually gained using the trading methodology set forth in the Complaint;

c.  The District Court calculated interest to be paid on the amount set forth above, which was erroneous since it was based on a mathematical fallacy; and

d.  The District Court Ordered a third-tier civil penalty, which is reserved for the most egregious actors despite O'Brien's lack of scienter and with no evidence of any harmed investors.

## **SUMMARY OF THE ARGUMENT**

The Complaint against O'Brien (A12) alleged unlawful conduct not known to be unlawful by anyone besides the Commission. The basis for the Commission allegations was two (2) Appendices to the Complaint that showed trading patterns in two stocks which were supposed to be representative of over 18,000 trading events that sometimes utilized a similar trading strategy. (A31; A34). The analysis was flawed on multiple levels, yet it was adopted in whole by the District Court. The only two similarities between the two examples set forth in the Appendices to the Complaint (A-31; A34) and the 18,000 events which occurred over a six-year period, was the fact that more than one trading account was used and the transactions occurred quickly. There was never any authority cited for the proposition that it is unlawful to trade in more than one account, nor is there any law dictating how long a trade or trading event must take to complete. Similarly, there is no law even indicating that it is illegal to place an order that narrows the spread on stock trades, which happens millions of times a day. There is no dispute that the Commission did not examine the trading details of all 18,000 trading events, yet the Court ultimately included all 18,000 trading events to calculate the quantum of disgorgement required to be paid by O'Brien and the civil penalty.

The Parties entered into a Consent Judgment in February 2023 wherein O'Brien agreed to be permanently restrained from engaging in unlawful conduct,

just as he has done since he started in the business thirty (30) years ago. (A1585). He neither admitted nor denied the allegations of the Complaint, rather, he agreed to leave to the Court the issue of whether disgorgement was an appropriate remedy. (A1585). The language of the Consent Order stated that the Court must conclude that disgorgement is appropriate in the first instance and thereafter, the analysis would turn to the amount of any disgorgement, taking into account the arguments of the Parties as well as the pleadings and related expert reports. (A1596). To determine if disgorgement was an appropriate remedy, the Court was required to engage in an analysis of the Record, which should have included more than simply adopting the Commission's expert report, which was not a component of the Complaint. The methodology that the District Court implemented, essentially performing no analysis, is akin to granting the Commission summary judgment, which was denied a few months earlier. (A1578). O'Brien did not enter into the Consent Judgment agreeing to that methodology and the concomitant result. In executing the Consent Judgment, O'Brien was in no way agreeing to the flagrant, inflammatory language that was used to describe his trading method, or what the Commission believed to be O'Brien's state of mind. Instead, O'Brien agreed to the substantiated facts, not the imaginative conclusions drawn therefrom. (A1585). If an analysis had been performed by the District Court, it would have shown that the Commission's expert's report (A262; A302; A1500) should have been discounted or disregarded

as it lacked both quantitative and qualitative support.  Instead, the Court adopted the faulty analysis and ordered disgorgement in excess of that which Defendant earned and a penalty far in excess of that which was sought by the Commission.  (SPA43).

## STANDARD OF REVIEW

The Court of Appeals reviews Securities Exchange Act disgorgement orders under the abuse of discretion standard.  Securities Exchange Act of 1934 §21, 15, U.S.C.A. §78u(d)(7).

## ARGUMENT

**I.      The District Court erred when it ordered disgorgement without making an independent finding that O'Brien was properly subject to disgorgement in the first instance pursuant to the express language of the Consent Judgment.**

The Court of Appeals reviews Securities Exchange Act disgorgement orders under the abuse of discretion standard. Securities Exchange Act of 1934 § 21, 15 U.S.C.A. § 78u(d)(7). O'Brien signed the Consent Judgment accepting the factual allegations of the Complaint as true while simultaneously believing that his trading strategy, and only the gains attributable to that strategy, would be analyzed to determine (1) if disgorgement was appropriate in the first instance, meaning his

gains were "ill-gotten;" and (2) the calculation of any gains on those trading strategy events. (A1585). The District Court did not engage in that analysis. If the District Court had conducted that analysis, the Court could not have found that the two trading strategy examples set forth in the Appendices to the Complaint (A31; A34) provided sufficient evidentiary support for the imposition of the Final Judgment. (SPA43).

The Consent Judgement terms and agreement was that O'Brien would accept the factual allegations as true for the purpose of addressing the issue of disgorgement, if any, and that he would refrain from securities law violations. (A1585; A1596). In exchange, the legal conclusions drawn from the allegations of the Complaint would be evaluated to determine if O'Brien's gains, if any, were derived from unlawful activity. (A1585; A1596). That contractual consideration, quid pro quo, under the terms of the Consent Judgment (A1596) was ignored since the District Court did not engage in any independent analysis to determine whether disgorgement was appropriate in the first instance. If the District Court was not going to perform that analysis, there would have been no reason for O'Brien to sign the Consent Order (A1585) as it offered him nothing else. The effect of that failure was to essentially grant a summary judgment and we know the District Court did not intend that result as the District Court had denied summary judgment on the same issues only months before. (A1578). Further, if the examples from the Appendices

12

to the Complaint (A-31; A34) were even given a cursory inspection, the District Court would learn that O'Brien's trading activity within those two stocks was not problematic, thus calling into question the details surrounding the other 18,000 trading events which the Commission purports followed the same strategy and which support a conclusion that disgorgement is appropriate, as required pursuant to the express terms of the Consent Judgment. (A1596). The Commission's entire analysis was flawed and should not have been relied upon. If O'Brien's actual trading had been dissected by the District Court, the District Court would have realized that the two examples appended to the Complaint, (A31; A34), which were supposed to be indicative of a much larger scheme, actually did not show what the Commission plead to be unlawful.

        A. <u>SHOP</u>: The Record shows that the transactions that surround the SHOP example fall far short of showing a violation of any securities law. SHOP was a series of fifteen (15) trades, where (and two (2) canceled orders) the Commission contended that somehow O'Brien's trading of four hundred and three (403) shares of stock somehow drove the stock of a twenty-five billion dollar company, that trades millions of shares a day, down (ignoring the fact that the stock was trading higher after his first three sell trades and a news related $7.00 drop that that happened 32 minutes <u>before</u> O'Brien's first trade) and that three hundred (300) shares pushed the price up $1.63 (again, despite the fact that O'Brien did nothing for 39 seconds during that time period and the stock price rose $1.10).

        B. <u>SLAB</u>: If the District Court analyzed this series of trades, the details of the transactions would show that the number of

shares being bought and sold (a total of 400) were much too small to push the price of the stock up or down. The Commission only shows O'Brien's transactions and ignores all other active traders buying and selling during that time, which purposefully distorts the actual activity. The Commission's contention was that shares sold worth $22,862.00 were able to move a $2.3 billion dollar company's stock down, which is not possible.

Where a District Court has found securities law violations as matter of law and fact, it has broad powers to order appropriate remedies, including the disgorgement of gains it deems to have been "ill-gotten." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-76 (2d Cir. 1996). The plain language of the February 3, 2023 Consent Order (A1585) required the Court to make a finding that O'Brien violated one or more securities laws prior to engaging in the exercise of assessing the quantum of disgorgement, if any. Once the District Court found federal security law violations, its choice of remedies is reviewable for an abuse of discretion. SEC v. Sourlis, 851 F.3d 139, 146 (2d. Cir. 2016); see also SEC v. Razmilovic, 738 F.3d 14, 32 (2d Cir. 2013). "A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions.". In re Sims, 534 F.3d 117, 132 (2d Cir. 2008), cited by SEC v. Govil, No. 22-1658 (2023).

O'Brien did not agree to abandon all relevant case law and legal standards in favor of the Consent Judgment. (A1596). O'Brien did not agree that he violated

14

any law; rather, in the Consent Judgment (A1596), O'Brien agreed to adopt the factual assertions, not the legal conclusions drawn therefrom, and to refrain from arguing about whether he violated a securities law, all for the purposes therein articulated. O'Brien trusted the Court to review the totality of the Record (A1) prior to determining whether disgorgement was an appropriate remedy in the first instance, and then, if so, an analysis of the appropriateness of the imposition of any economic sanction. The District Court, however, prior to hearing O'Brien's testimony, already decided that the District Court's only function was "essentially an assessment of various dollar values with respect to disgorgement and appropriately imposed monetary relief on this SEC action". (A1760). The District Court asked the Commission to get her "its prejudgment interest calculation by Monday…" (A1760).

The words "if any" were specifically inserted into the Consent Judgment to reflect that there was a range of possible disgorgement. The term "if any" meant that the range of possible outcomes for O'Brien could be anywhere from zero (or less than zero) to a ceiling at or near the Commission's expert's evaluation. Instead, the District Court on the same Record, essentially granted the Commission the summary judgment that was denied in January 2023 (A1578) and rubber-stamped the Commission's disgorgement and other figures despite their mathematical impossibility of net profits. Contrary to existing law, there was no finding that

15

Appellant's profits were "ill-gained." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-76 (2d Cir. 1996).

The District Court's Opinion reveals that the District Court interprets the language of the Consent Judgment to mean that their only function is with respect to determining the quantum of disgorgement. (A1596). The word quantum also refers to the smallest amount of something. The District Court characterized O'Brien's trading as manipulative and a scheme (SPA27) and the District Court adopted the Commission's position that O'Brien was engaged in unlawful behavior (SPA1). The problem with that conclusion is that there is not a law prohibiting, or even defining coordinated trading, nor is there any known law that prohibits O'Brien's price discovery trading strategy. O'Brien agreeing not to violate a law that does not exist is not proof of a violation of the law that prompted the District Court's imposition of a remedy of disgorgement or of a civil penalty.

The remedies of disgorgement and a civil penalty each require specific findings of fact related to the underlying allegedly wrongful behaviors; they must, or the measures associated with those remedies would be cast in terms of strict liability and they are not. Instead, the appropriateness of disgorgement in the first instance is grounded in a finding that the underlying behavior violates the law and thereafter, the quantum of disgorgement is determined by reference to the actual conduct and the instances of that conduct. The quantum of disgorgement relates to

16

underlying proofs of fraudulent behavior in a specific manner, not merely through providing two (2) examples of trading in two stocks (which did not even capture unlawful behavior) and thereafter assuming that the entirety of the trades must also violate the law.  (A31; A34). The Consent Judgment language confirms the foregoing by providing that the District Court must, in the first instance, determine if disgorgement is appropriate. (A1585; A1596).  If disgorgement was a matter of presumption, that language would not exist. If the only issue was the quantum of disgorgement, there was no benefit to O'Brien signing the Consent Judgment.

O'Brien testified that price discovery is not a method by which traders are deceived or induced to do anything.  (A111).  Price discovery enables buyers and sellers to set market prices of tradable stocks and includes an analysis of what sellers are willing to accept and what buyers are willing to pay, so it is concerned with finding the spot price, or the equilibrium price, that facilitates the greatest liquidity for a particular stock.  (A92;).  There is nothing unlawful about it.  It is complex, and after reading the Court's opinion, clearly misunderstood. (SPA1).  For example, the District Court stated that the purpose of what is called a helper account was to artificially affect the price of the stock, which is not accurate.  (SPA3).  O'Brien testified on multiple occasions, in great detail, about his trading strategy.  (A111; A1760). It never involved luring anyone into the marketplace or inducing anyone to buy or sell at artificial prices.  There is no trickery involved in price discovery as

O'Brien was placing actual bona fide buy and sell orders.  (It should be noted that fifteen (15) of seventeen (17) orders executed in SHOP or 88% were filled, while high frequency traders cancel 96% of their orders). In other words, no action of O'Brien's artificially manipulated the market since his orders were bona fide.  Yet, the District Court adopted the Commission's position that O'Brien's conduct was not only unlawful, but deceptive and fraudulent, (SPA1), despite the fact that nobody was deceived, no alleged victims were identified, and there is nothing fraudulent about the use of price discovery.  O'Brien continues to deny the notion that he had any intent to defraud or deceive anyone with his trading. The Commission did not charge O'Brien under the mirror criminal securities laws statutes and waited over eight (8) years before seeking the extraordinary remedy of injunctive relief; a form of relief that is by definition grounded in urgency.

   a. <u>The was no proof that the Appellant's gains, ill-gotten or not, represented a reasonable approximation of the amount ordered to be disgorged</u>.

 Disgorgement is an appropriate equitable remedy so long as the amount does (1) not exceed the defendant's "net profits" from the wrongdoing; and (2) is "awarded for victims." <u>Liu</u> at 1.  In 2020, the United States Supreme Court decided <u>Charles C. Liu, et al. v. Securities and Exchange Commission</u>, 591 U.S. ___ (2020).

In Liu, Charles Liu and his wife, Xin Wang solicited $27 million from foreign nationals under the EB-5 Program which is administered by the United States Citizenship and Immigration Services and is governed in part by the federal securities laws.  The scheme solicited investors who could gain permanent United States residency by investing in approved commercial enterprises, a cancer treatment center in this instance.  The private offering memorandum used to lure potential investors indicated that the bulk of the contributions would go toward construction costs related to the cancer treatment center, and that only a small portion would be allocated for administrative fees identified to include accounting and legal expenses.  The Commission's investigation revealed that nearly $20 million dollars was spent on marketing and salaries, and another sizable portion was diverted to personal accounts and to a company under Wang's control. The District Court ordered disgorgement of the entire amount raised minus a small amount which remained in the corporate account for the cancer center project.  Liu and Wang objected to the disgorgement amount as it did not account for their business expenses.  They appealed and the Ninth Circuit affirmed. They then appealed to the United States Supreme Court.

The United States Supreme Court in Liu cited the Dodd Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1844, instructing that the "SEC's equitable, profits-based remedy most do more than simply benefit the public at

19

large by virtue of depriving a wrong-doer of ill-gotten gains.  To hold otherwise would render meaningless the latter part of §78(u)(d)."  <u>Liu</u> at 16.  Section 78(u)(d) restricts equitable relief to that which "may be appropriate or necessary for the benefit of investors."  <u>Liu</u> at 14.  The Supreme Court recognized that the SEC does not always distribute disgorged funds to victims and that these sums can be deposited in the Treasury, however, the Court indicated that the statute provides little guidance as to whether the practice of depositing disgorged funds satisfies the statute's mandate that the remedy be "appropriate or necessary for the benefit of investors.".  § 78(u)(d).  The Supreme Court similarly held in <u>Mertens v. Hewitt Associates</u>, 508 U.S. 248, (1993), that the phrase "appropriate equitable relief" does not mean "equitable relief at large."  <u>Mertens</u> at 253.

<u>Liu</u> ultimately stands for the proposition that disgorgement is an appropriate equitable remedy so long as the amount does (1) not exceed the defendant's "net profits" from the wrongdoing; and (2) is "awarded for victims."  <u>Liu</u> at 1.   On appeal, the Eighth Circuit reversed the conviction despite finding that Naftalin had engaged in a fraudulent schedule.  The Court held that the government must prove some impact of the scheme on investors, as opposed to agent-brokers, to establish a Section 17(a)(1) violation.

In this matter, the averment in the Complaint relative to the timeframe within which purported "ill-gotten" gains were to be calculated started "…when the first

account trades and ends when all of the involved accounts closed out their positions (or when the day ends)." There was no analysis done consistent with these parameters. (A12). The Commission's expert admitted to artificially modifying the parameters set forth in the Complaint to prepare his report and most importantly, the Commission's expert testified that he did not participate at all in the preparation of the Complaint and the analyses of the examples presented in the Appendices to the Complaint. (A262; A302; A994). That expert's report then could not be considered by the District Court as a "fact in the Complaint" for the purposes of calculating a disgorgement amount pursuant to the terms of the Consent Judgment.

O'Brien supplied the Commission and the Court with his tax returns, penalty of perjury documents that show the total short term capital gains derived from all forms of trading over the relevant time period, (A1707), not just those involving what the Commission identified as "coordinated trading". (A12). The District Court, however, ignored those proofs in favor of the Commission's expert report (SPA1) which set forth net capital gains far in excess of any amount that was ever earned and could not have been accurate.

O'Brien's total short-term capital gains for all trading activity (not merely those types of trades identified by the Commission as problematic) for the years in issue as reported on his federal income tax returns (A1707) are set forth below.

21

Those short-term capital gains include a greater time frame than set forth in the

Complaint (A12) since by definition short-term capital gains include transactions

which started and concluded within one calendar year, a longer range than the

Complaint and the Commission's expert considered:

| | |
|---|---|
| 2015 | $13,333 |
| 2016 | $2,119,240 |
| 2017 | $(298,171) |
| 2018 | $744,316 |
| 2019 | $610,187 |
| 2020 | $1,286,966 |

TOTAL SHORT TERM CAPITAL GAIN: $4,475,871

The District Court's analysis had to include a finding of unlawful conduct

and then a determination of the range of possible disgorgement which could not

have exceeded the total net profit earned during the applicable timeframe. The

District Court's opinion noted that "O'Brien's most active period of coordinated

trading occurred between mid-September 2015 and December 2016" and that

"About 75% of O'Brien's coordinated trading events during this time resulted in

net profits." (SPA4; SPA5). That conclusion is not supported by the Record.

b. The District Court erred by including the Vanguard trading
in the calculation of disgorgement.

As stated, pursuant to the dictates of Liu, every violation alleged requires a

finding of intent before the issue of disgorgement can even be addressed. Liu v.

SEC, 140 S.Ct. 1936.

Despite the foregoing, the District Court opined that since it was "possible for him to place orders for trading through his Vanguard account" there is "no basis to conclude that the Vanguard transactions should be excluded." (SPA1). O'Brien testified, however, that he did not use the Vanguard platform for the purported problematic trading. O'Brien testified that the Vanguard platform was too slow for him to be able to use his price discovery strategy and the majority of the profits in that account resulted from trades spanning months or years. (A111; A1760). If O'Brien did not use price discovery in connection with the Vanguard account, he could not have the requisite intent associated with a conclusion that the gains generated from the Vanguard account were coordinated trading and properly subject to disgorgement. The trading within O'Brien's Vanguard account was not and could not be "coordinated trading" and should have been subtracted from the total short term gain calculation. (SPA1).

c. The District Court erred in failing to deduct the payment of taxes on the amount purportedly "ill-gained".

In SEC v. Davis, 2022 U.S. Dist. Lexis 142073, a case post Liu, a jury found the defendant liable for insider trading and awarded the Commission injunctive relief as well as the disgorgement of defendant's mark-to-market profits, subtracting a small amount for transaction costs, and prejudgment interest. In a subsequent enforcement action, the defendant argued that the Court should deduct the capital

23

gains tax he paid for profits on the 2016 trade. In measuring the scope of illicit gains, the court decided that the disgorgement remedy must take into account the wrongdoer's "net profits" stating that whether one labels the relief "disgorgement," an "accounting," or "restitution," this equitable remedy is "tethered to a wrongdoer's net unlawful profits" because, while he should not be permitted to "profit 'by his own wrong,'" he should not be forced to pay more than he actually gained. Liu v. Sec. & Exch. Comm'n, 140 S. Ct. 1936, 1942-43, 207 L. Ed. 2d 401 (2020). (quoting Tilghman v. Proctor, 125 U.S. 136, 145-46, 8 S. Ct. 894, 31 L. Ed. 664, 1877 Dec. Comm'r Pat. 286 (1888)). The concept of "net profits" therefore measures a wrongdoer's liability based on his "actual, not . . . possible, gains." Tilghman, 125 U.S. at 145. Courts calculate this amount by allowing "credits or deductions" that achieve the remedy's purpose—that is, "to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty." Restatement (3d) of Restitution & Unjust Enrichment § 51(4)-(5) (2011); *see also* Providence Rubber Co. v. Goodyear, 76 U.S. 788, 804, 19 L. Ed. 566 (1869) ("'Profit' is the gain made upon any business or investment, when both the receipts and payments are taken into the account."). In this matter, the District Court erred in failing to allow for any credits for the payment of capital gains taxes.

**II.** **The District Court's finding that O'Brien acted with scienter is unsupported by the Record, thus the imposition of a third-tier penalty is an abuse of discretion.**

Despite O'Brien's testimony on multiple occasions to the contrary (A111; A1760), the District Court referred to O'Brien's trading strategy as a "scheme" involving "fraud, deceit, and manipulation", (SPA-27), despite the fact that he was not scheming, defrauding, and deceiving anyone. There was no dispute nor allegation that O'Brien was trading for anyone other than himself in his own accounts. There has been no authority cited at any stage of the proceedings in any forum that it is unlawful to trade in more than one account. There was no evidence that the small size of O'Brien's orders could have moved or manipulated the market to the detriment of anyone. The District Court adopted the totality of the Commission's expert report, despite the fact that the report focused solely on O'Brien's stock purchase or sale orders and disregarded other purchase or sale orders coming into the market during the time O'Brien was actively trading. Of course, any 'movement' will appear as though O'Brien is the one causing movement of the stock when no other options are shown, even when he's doing nothing.

It is undisputed that O'Brien traded the exact same way as he did as a market maker, with the only exception that he traded from home versus for a broker-

dealer, and that it was not possible to have all the tolls available to a market-maker in one standard brokerage account. On page 26, the District Court indicated that "O'Brien misleadingly simulated buy or sell interest in securities which impacted the price of those securities." (SPA26). To the contrary, there was no simulation involved whatsoever. O'Brien placed bona-fide buy and sell orders. The District Court is referring to layering and spoofing, which are manipulative techniques and which were not plead by the Commission and not the conduct in which O'Brien was engaged. (SPA26).

Pursuant to 15 U.S.C. 77t(d), the Commission is permitted, and the Court may choose to impose "upon a proper showing", a civil penalty to be paid by the person who committed such violation. Specifically, 15 U.S.C. 77(d)(2)(A) reads: "The amount of the penalty shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (i) $5,000 for a natural person or $50,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation."

The law with regard to the imposition of civil penalties is clear that in order to obtain a Tier II or Tier III penalty, scienter must be proven and that is not blanket scienter; specific proofs must exist in the record. This is a penalty and cannot be imposed on a random, arbitrary basis. The District Court, however, used

the Commission's faulty calculation regarding the gross profit O'Brien generated to Order a $10.3-million-dollar civil penalty; an amount that O'Brien never earned. O'Brien did not agree to the legal conclusions set forth in the Complaint. He did not agree that he acted with scienter simply because it says so in the Complaint. The term "scienter" is a legal term of art, not a factual allegation. O'Brien agreed to allow the District Court to determine if his trading methodology violated a law, and the District Court's Opinion shows instead a blanket adoption of the Commission's conclusions. (SPA1; SPA42; SPA43). The Commission did not set forth proof that O'Brien violated the law. The Court's Opinion rested in large part on the fact that O'Brien continued to trade while this investigation was ongoing. (SPA1; SPA42; SPA43). That conclusion ignores that O'Brien did not believe he was doing anything wrong. The Commission pointing to a trading they identify as "coordinated" without any statutory or other basis is not a warning that a person has violated the law. (A12; A16). O'Brien's continued trading was his response that what he was doing was perfectly appropriate and consistent with his history as a market maker. The reality is that the Commission had all the information they needed to move forward with their claims at least three years before the actual Complaint was filed. O'Brien's objectively reasonable belief was further supported by the fact that it took so long to formulate the Complaint, and that once filed, the Complaint still did not state a cause of action applicable to him.

(A12). O'Brien had no knowledge he was breaking a law, and the fact that no injunctive relief was ever sought only further supported his belief that he was within the confines of the law. The portions of the Court 's Order related to the civil penalty imposition contain language related to layering and spoofing, neither of which occurred, and neither of which was pled. (SPA43).

There is no evidence that anyone was harmed. There is no evidence that O'Brien harbored an intention to harm. In SEC v. Govil, (2023) the Second Circuit Court of Appeals found that the District Court therein abused its discretion when it concluded that disgorgement was authorized without finding that defrauded investors suffered pecuniary harm. *Id.* at 12. Disgorgement is not authorized by the Exchange Act because the disgorgement provisions in that statute "require a showing that investors have been harmed, and the court did not find that the SEC had made such a showing." Similarly, the District Court held in SEC v. Ahmed, et al. (21-1686) (2023) that both § 78u(d)(5) and § 78u(d)(7) "must comport with traditional equitable limitations as recognized in Liu." Ahmed, 72 F.4th at 396. One of those equitable limitations is that disgorgement must be "awarded for victims." Liu, 140 S. Ct. at 1940. An investor who suffered no pecuniary harm as a result of the fraud is not a victim. The District Court in Govil did not find that the investors suffered pecuniary harm, therefore the Second Circuit Court of Appeals found that the District Court abused its discretion in concluding that the

investors were victims for purposes of disgorgement. Again, there is no evidence that anyone was harmed.

## **CONCLUSION**

For the reasons set forth above, the District Court's Order must be reversed and remanded for further proceedings, or summarily dismissed.

Date:  November 7, 2023                    Respectfully submitted,


By:     /s/ John M. Hanamirian
        John M. Hanamirian
        jmh@hanamirian.com
        HANAMIRIAN LAW FIRM, P.C.
        40 East Main Street
        Moorestown, New Jersey 08057
        Telephone: (856) 793-9092
        Facsimile: (856) 793-9121
        *Counsel for Respondent-Appellant*
        *James David O'Brien*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(g)

I hereby certify pursuant to Federal Rule of Appellate Procedure 32(g) that the attached Brief is proportionally spaced, has a typeface (Times New Roman) of 14 points, and contains 6,720 words (excluding, as permitted by Federal Rule of Appellate Procedure 32(f), the cover page, the table of contents, the table of authorities, the certificate of compliance, and the signature block), as counted by the Microsoft Word processing system used to produce this brief.

Date: November 7, 2023

By: */s/ John M. Hanamirian*
John M. Hanamirian

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2023, I electronically filed the foregoing Appellate Brief of Appellant James David O'Brien with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users and will be served by the Appellate CM/ECF system.

*/s/ John M. Hanamirian*
John M. Hanamirian

# SPECIAL APPENDIX

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Opinion and Order of the Honorable Denise Cote, dated May 25, 2023 ............................................... SPA-1

Order of the Honorable Denise Cote, dated May 25, 2023 ......................................................... SPA-42

Final Judgment as to Defendant James David O'Brien, dated June 2, 2023 .................................. SPA-43

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                          :
SECURITIES AND EXCHANGE COMMISSION,       :
                                          :
                        Plaintiff,        :      21cv9575 (DLC)
                                          :
           -v-                            :      OPINION AND
                                          :         ORDER
JAMES DAVID O'BRIEN,                      :
                                          :
                        Defendant.        :
                                          :
---------------------------------------- X

APPEARANCES:

For plaintiff Securities and Exchange Commission:
Bennett Ellenbogen
Paul G. Gizzi
Chevon N. Walker
Richard R. Best
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004

For defendant James David O'Brien:
John M. Hanamirian, Esq.
Hanamirian Law Firm
40 E. Main Street
Moorestown, NJ 08057

DENISE COTE, District Judge:

    The Securities and Exchange Commission ("SEC") brings this

securities fraud action against James David O'Brien, alleging

that O'Brien engaged in a multimillion-dollar market

manipulation scheme.  On February 3, 2023, the parties settled

with respect to injunctive relief and stipulated that any claim

for monetary relief would be determined by the Court on a motion

SPA-2

by the SEC.  The SEC filed its motion for monetary relief on
March 17.  Based on the hearing held on May 19, and for the
following reasons, the SEC's motion for monetary relief is
largely granted.

## Background

Before analyzing the appropriate amount of monetary relief,
the background of this case is described.  The first section
outlines O'Brien's manipulation scheme, as articulated in the
complaint.[1]  The second section explains the evidence relevant to
monetary relief that was submitted in connection with this
motion.  The third section describes the procedural history in
the case.

I.    Allegations in the Complaint

A.    O'Brien's Scheme

Between September 17, 2015 and at least October 29, 2020,
O'Brien, a securities trader, engaged in an ongoing market
manipulation scheme involving what the complaint calls
"coordinated trading events."  The complaint defines a
coordinated trading event as follows:

---

[1] As explained below, the parties agreed that for the purposes of
this motion, the factual allegations in the complaint are taken
as true, except with respect to the quantum of disgorgement.

2

SPA-3

- Two or more accounts trade and hold positions in the same exchange-traded stock, on the same day, and during the same period of time;

- The event starts when the first account trades and ends when all the involved accounts close out their positions (or when the trading day ends);

- At least one of the accounts behaves as a winner account -- an account that has an average transaction size greater than or equal to 1,000 shares; and

- At least one of the involved accounts behaves as a helper account -- an account that has an average transaction size of less than 500 shares and is held at a different brokerage firm than the winner account.

O'Brien engaged in a manipulative scheme in which he used the helper accounts to affect artificially the price of various stocks to the benefit of the winner accounts. In doing so, O'Brien acted with the intent to induce other market participants to fill orders at the artificially inflated or deflated prices.

According to the complaint, O'Brien executed over 18,000 coordinated trading events in eighteen accounts at fourteen different brokerage firms. For some of these events, O'Brien would start by placing several sell orders for a certain stock in the helper accounts. This would create the false appearance of sell interest in the stock, which would artificially decrease the stock's price. Then, O'Brien would acquire larger positions in the same stock in the winner accounts at the artificially

3

SPA-4

deflated price.  Once the winner accounts finished buying the
stock, O'Brien often cancelled remaining open helper account
sell orders.

For other coordinated trading events, O'Brien began by
acquiring a position in a stock in the winner accounts.  Then,
he would place a series of smaller buy orders for the same stock
in the helper accounts to artificially increase the stock price.
O'Brien would then liquidate the winner account positions at the
inflated price and cancel remaining open buy orders in the
helper account.

O'Brien aimed to generate profits for the winner accounts
that were greater than the losses in the helper accounts.
Through his actions, O'Brien intended to induce market
participants to sell to and purchase from the winner accounts at
prices that were artificially impacted by the helper accounts.

O'Brien's most active period of coordinated trading events
occurred between mid-September 2015 and December 2016.  During
this time, he engaged in 11,738 coordinated trading events using
ten accounts at eight brokerage firms.  About 75% of O'Brien's
coordinated trading events during this time resulted in net
profits.  Even deducting the net-unprofitable coordinated
trading events, O'Brien still obtained an overall net gain
during this period.

4

SPA-5

O'Brien then reduced his coordinated trading, but he
continued executing the events through at least October 2020.
From January 2017 to October 2020, he engaged in over 6,300
coordinated trading events using at least nine accounts at seven
brokerage firms.  Roughly 74% of the events during this time
were net profitable, and, even deducting the events that led to
net losses, O'Brien still obtained an overall net gain during
this period, as well.

B.   O'Brien's Interactions with Brokerage Firms and the
SEC

O'Brien attempted to hide his coordinated trading activity
by executing the winner and helper trades in accounts held at
different brokerage firms.  Nonetheless, several of the firms
O'Brien used for his scheme identified his activity as
potentially manipulative trading and sent warnings to him that
explained relevant concepts of prohibited manipulation.  For
example, in October 2015, one firm identified an apparent "wash
trade" by O'Brien and explained to him that manipulative trading
practices involve any trades that have the purpose of
"[c]reating or inducing a false, misleading, or artificial
appearance of activity in the security" or "setting a price that
does not reflect the true state of the market in the security."
These kinds of warnings also informed O'Brien that manipulative

5

SPA-6

trading practices are serious violations of exchange trading rules that could result in regulatory penalties.

In March 2016, a different firm contacted O'Brien about potential "layering" in his account.  The firm explained to O'Brien that layering

> involves the placement of multiple, non-bona fide, limit orders on one side of the market at various price levels . . . to create the appearance of a change in the levels of supply and demand, thereby artificially moving the price.  An order is then executed on the opposite side of the market at the artificially created price, and the non-bona fide orders are immediately canceled.

The firm stated that layering was a manipulative trading practice.

At least one firm also asked O'Brien directly whether he engaged in coordinated trading.  Specifically, in March 2019, a representative of one firm emailed O'Brien as follows:

> [T]rading activity in National General Hlgs (NGHC) on March 20, 20129 [sic] where your account appeared to submit multiple sell orders [in less than a minute] that appeared to contribute to the market quote narrowing from 24.31/24.77 to 24.26/24/34.  In addition, we noted your account submitting buy orders over [a period of approximately 30 seconds] that appeared to contribute to the market quote moving from 24.11/24.53 to 24.36/24.49.  <u>Please provide a written explanation regarding your investment strategy and rational [sic] for order placement NGHC.  Do you coordinate your trading with other accounts or individuals outside of [this firm]?</u>

(Emphasis added.)  Roughly three weeks later, O'Brien responded to the email generally, but did not answer whether he

6

SPA-7

coordinated his trading.  Thus, the firm representative responded, "Would you please confirm the below question?  Do you coordinate your trading with other accounts or individuals outside of [this firm]?"  To this, O'Brien responded misleadingly, "I don't coordinate with other individuals . . . . I mostly trade off of Upgrades or recommendations on CNBC." O'Brien did not mention that he was coordinating trades with other accounts he held at other firms.

The accounts that O'Brien used for coordinated trading events were often closed by brokerage firms.  When this happened, O'Brien would open new accounts at other firms in his or his wife's name to continue the coordinated trading scheme. For example, in October 2015, a few weeks after sending O'Brien the warning described above regarding wash trades, the firm closed his account.  After the account was closed, O'Brien increased his usage of a different account at a different firm. Then, in the following months, he opened new accounts at two other firms and used those accounts to continue his coordinated trading events.

O'Brien never disclosed his coordinated trading when brokerage firms asked about his trading activity.  For example, one firm's compliance department asked the firm's branch manager

SPA-8

to contact O'Brien to discuss his trading activity.  The firm
told the branch manager:

> We'd like you to ask [O'Brien] how he chooses which
> stocks to trade; i.e., does he go by fundamental
> analysis, technical analysis, focus on specific
> sectors/industries, etc.?  Also, please ask him if he
> is using a 3rd party service (aside from what the firm
> provides) such as a website or automated trading
> software.  As I said on the phone, this is somewhat
> time sensitive.  Hopefully, you are able to get in
> touch with him and will not have to resort to leaving
> a message, telling him his internet access will be set
> to View Only until he returns your call.

The branch manager later reported back saying that O'Brien had
told him that he "[l]ooks primarily at momentum stuff, buys when
it falls 30/40 cents, likes to try to catch a bounce.  Likes to
stay in the same stocks he knows.  Says he doesn't use software.
'Trades the news'.  Not actively scanning."  In fact, however,
99% of the gains O'Brien earned in his accounts with that firm
were attributable to coordinated trading.  That is, rather than
just "looking at momentum" and "trying to catch a bounce,"
O'Brien was creating the momentum and the bounce through
coordinated trading events.  Roughly two weeks after the
communications between this firm and O'Brien, the firm closed
his accounts.

Finally, O'Brien continued to engage in coordinated trading
even after learning that the SEC was investigating him.  The SEC
subpoenaed O'Brien in May 2018 relating to his trading activity.

8

SPA-9

He provided a proffer to the SEC and criminal authorities in August 2018.  In May 2019, the SEC subpoenaed him a second time to provide testimony.  O'Brien refused to appear for testimony, and thus in October 2019, the SEC filed a subpoena enforcement proceeding.  He was ordered to testify in December 2019.  SEC v. O'Brien, 19 Misc. 468 (KPF), 2019 WL 7207485, at *4 (S.D.N.Y. Dec. 27, 2019).[2]  Despite these ongoing proceedings, O'Brien continued to engage in coordinated trading through at least October 2020.

II.  Evidence Submitted Regarding Calculation of Monetary Relief

     A.   The SEC's Submissions

     In connection with its motion for monetary relief, the SEC submitted several evidentiary materials relevant to calculating monetary relief.  Chief among these was an expert report (the "Orlov Report") from SEC Financial Economist Dr. Evgeny Orlov.

     In the Orlov Report, Dr. Orlov explains that he analyzed O'Brien's stock trading activity to identify instances of coordinated trading and calculate profits associated with such trading.  Dr. Orlov analyzed trade blotter data from 19

---

[2] O'Brien appealed the order requiring him to testify.  That appeal was denied on January 11, 2021.  SEC v. O'Brien, 842 F. App'x 652, 655 (2d Cir. 2021).

SPA-10

brokerage firms.[3]  Based on this data, Dr. Orlov concluded that
O'Brien engaged in 19,308 coordinated trading events[4] between
December 2015 and May 2021.[5]

The Orlov Report includes a detailed analysis of three
specific coordinated trading events.  The Orlov Report also
includes analysis on the profitability of O'Brien's coordinated
trading activity.  Dr. Orlov concluded that of the 19,308 events
he identified, 14,275 or 73.9% resulted in positive net profits
totaling roughly $10.4 million.  The remaining events resulted
in negative net returns totaling $4.3 million.  His activity
resulted in an overall net gain of roughly $6.116 million.

---

[3] Dr. Orlov originally received data from 22 firms, but, after
eliminating the repetitive data, analyzed data from only 19.

[4] Although Dr. Orlov opines that the definition of "coordinated
trading event" used in the complaint is an appropriate
description of the kind of trading activity engaged in by
O'Brien, the definition he used in his report is slightly
different than that used in the complaint.  According to Dr.
Orlov, the minor variations resulted in a slightly more
conservative analysis because: (1) Dr. Orlov analyzed only
coordinated trading events that ended on the same day that they
began; and (2) he required coordinated trading events to include
at least one instance where (i) the direction of the
transactions in the helper account was opposite the direction of
the immediately following winner account transactions, and (ii)
the winner account transactions did not lag the helper
transactions by more than 30 seconds.

[5] The time period used in the Orlov Report is slightly longer
than that used in the complaint because the trade blotter data
analyzed by Dr. Orlov included trade data beyond October 2020.
O'Brien testified that he engaged in the same kinds of
coordinated trading behavior both before 2015 and after 2020.

Finally, the Orlov Report includes Dr. Orlov's analysis of whether coordinated trading events were unusually profitable for O'Brien relative to his other trading activity. Dr. Orlov found that O'Brien spent $11.28 billion to purchase shares in coordinated trading events from December 2015 to May 2021. During the same period, O'Brien spent $17.533 billion to purchase shares in all of his trading activity, including both coordinated trading and non-coordinated trading. Thus, 64.3% of the overall dollar amount spent to purchase stocks from December 2015 to May 2021 was spent on coordinated trading events.

By contrast, however, Dr. Orlov concluded that profits from coordinated trading events accounted for 95.4% of O'Brien's overall profits during that period. Dr. Orlov arrived at that percentage by comparing O'Brien's overall profits from December 2015 to May 2021 -- $6.413 million -- to his profits from coordinated trading events during the same time -- $6.116 million.

Dr. Orlov also prepared an amended expert report (the "Amended Orlov Report") dated September 16, 2022. In the Amended Orlov Report, Dr. Orlov explained that he analyzed additional trade blotter data from two other brokerage firms that he received after submitting his initial report. He concluded that this data had only a minimal effect on his

11

SPA-12

initial results and therefore none of his opinions in the
original report changed.  The Amended Orlov Report also provided
certain responses to opinions offered by O'Brien's proffered
expert, Michael Dorsey.  This section of the Amended Orlov
Report is primarily relevant to O'Brien's liability and so is
not summarized in this Opinion, which addresses the appropriate
amount of monetary relief.

     In connection with the instant motion, Dr. Orlov submitted
a declaration (the "Orlov Declaration").  The Orlov Declaration
incorporates his prior two reports and provides additional
analysis directed at the relief requested by the SEC in its
motion for monetary relief.  Specifically, because his reports
did not account for trade commissions and fees in the net profit
calculations, the Orlov Declaration includes analysis of these
factors.

     To calculate commissions, Dr. Orlov aggregated the
commissions corresponding to coordinated trading events for six
(out of eighteen total) brokerage firms that provided
information on trade commissions in their blotter data.  The
commissions from these six firms totaled $162,199.  Dr. Orlov
then used blotter data from the same firms to estimate the
monthly commission rate for each month by dividing the total
monthly commissions across the six firms by the number of shares

12

purchased or sold across the six firms in the same month.  For
the remaining twelve firms without data on commissions, Dr.
Orlov multiplied the estimated monthly commission rate by the
number of traded shares that were associated with coordinated
trading events.  Based on this, Dr. Orlov concluded that the
total estimated commissions across the twelve brokerage firms
that did not submit commission data is $476,539.

To calculate the SEC fees that O'Brien may have paid to
firms for sales of securities associated with coordinated
trading events in the relevant time, Dr. Orlov used the
published historical rates for SEC fees applicable at the time
of each event.  This calculation yielded $229,620 in fees.  Dr.
Orlov then aggregated his calculations for the fees, the
commissions paid on the six firms that provided commission data,
and the estimated commissions from the twelve firms that did not
provide commission data.  This resulted in a total amount of
commissions and fees of $868,358.

After calculating the total commissions and fees, Dr. Orlov
calculated the final net profits on coordinate trading events
from December 2015 to May 2021.  Subtracting $868,358 from
$6,111,757, Dr. Orlov determined O'Brien's total net profits to
be $5,243,399.  This is the disgorgement amount that the SEC
seeks.

Finally, because, as explained above, the period originally examined by Dr. Orlov was slightly longer than that identified in the complaint, Dr. Orlov also calculated O'Brien's total net profits from December 2015 to October 2020 to reflect the shorter time frame of the complaint.  Dr. Orlov concluded that during this period, O'Brien earned a total net gain on coordinated trading events of $6,065,680.  Subtracting the same calculation of $868,358 in commissions and fees[6] would yield a total net profit of $5,197,322.

In addition to the materials from Dr. Orlov, the SEC also submitted a declaration from Stephen Johnson, a supervisory staff accountant at the SEC.  Johnson calculated prejudgment interest on the SEC's proposed disgorgement amount of $5,243,399 of $370,547.59.  After oral argument, the SEC submitted another declaration from Johnson that calculated prejudgment interest on an award of $6,065,680, which represented O'Brien's net gains during the period alleged in the complaint but did not account for commissions and fees paid by O'Brien.  Finally, the SEC submitted a declaration from attorney Bennett Ellenbogen, noting that the SEC had requested that O'Brien return a sworn statement of financial condition ("SFS") if he planned to argue that the

---

[6] Dr. Orlov did not present a different calculation of commissions and fees for the shorter period.

14

SPA-15

Court should consider his financial condition in deciding this motion. The declaration from Ellenbogen explained that O'Brien never provided an SFS.

    B.   O'Brien's Submissions

    O'Brien also submitted evidentiary materials in his opposition to the SEC's motion. These consist primarily of an affidavit and declaration from O'Brien himself. The vast majority of the affidavit and declaration is devoted to O'Brien contending that his activities were not illegal, refuting the complaint's interpretation of O'Brien's trading activity, suggesting that the SEC has conducted a "witch hunt" to find him liable for securities fraud, and arguing that only two trades should be considered in analyzing the appropriate amount of disgorgement. Only a handful of paragraphs are relevant to the calculation of disgorgement. These paragraphs are substantially the same in the declaration and the affidavit and contend the disgorgement should be in the amount of $110,909.03.

    In these paragraphs, O'Brien opines that he "should not be ordered to disgorge more than 14.3% of the net profit [he] may have made from September 2015 through October 2020." To arrive at 14.3%, O'Brien first notes that the Orlov Report concluded that 64.3% of the dollar amount O'Brien spent to purchase securities from December 2015 to May 2021 was spent on

15

coordinated trading events.  He then contends, "If I wore a
blindfold and picked stocks and trades on a random basis, I
would have been correct half of the time without any price
discovery."  (O'Brien uses the term price discovery to refer to
the activity that the SEC terms coordinated trading.)  O'Brien
thus appears to contend that 14.3% is a proper multiplier by
subtracting 50% from 64.3%, although he provides no analysis as
to why that is an appropriate calculation.

To arrive at a net profit figure, O'Brien starts by
identifying a total short-term capital gain of $4,475,871 on his
tax returns from 2015 to 2020.  This figure understates his
profits from his coordinated trading, however, since those
profits would have been reduced by his losses in the remainder
of his trading.  O'Brien then subtracts from this number the
short-term capital gain tax rate of 30%.  O'Brien calculates a
further reduction for certain specific profits because he
contends that trading at one firm, Vanguard, "did not and could
not" occur within 30 seconds (as required by Dr. Orlov's
conceptualization of coordinated trading).  Finally, O'Brien
subtracts commissions and fees purportedly calculated using the
SEC's method.  Notably, O'Brien estimates the commissions and
fees based on the full $4,475,871, rather than the adjusted
amount after the Vanguard trades and taxes were deducted.  After

16

subtracting all of these amounts, O'Brien arrives at a "new net profit amount" of $1,551,175.35.

Then, O'Brien purports to apply the multiplier he calculated earlier to this $1,551,175.35 amount. Almost incomprehensibly, O'Brien states:

> [A]pplying a 50% rate for O'Brien under the theory that he would have been successful in trading at least half of the time without employing any methodology, a disgorgement amount of $110,909.03 ($1,551,175.35 divided by 2 and then multiplied by 14.3%) is the maximum that could be imposed, if any.

Of course, $110,909.03 is not 50% of $1,551,175.35, nor is it 14.3% of that number. Instead, it is 7.15% of $1,551,175.35.

To summarize, to the extent that O'Brien's statements on disgorgement can properly be termed "analysis," that analysis is as follows. Start by assuming (without any support) that in a but-for scenario, O'Brien would have been successful in his trading activity 50% of the time. Then, subtract 50% from 64.3% even though the 64.3% represents not the profits earned on O'Brien's trades in the relevant time, but rather the proportion of funds O'Brien spent on coordinated trading activity. Take that 14.3% and arbitrarily divide it by two to yield 7.15%. Then, apply that 7.15% multiplier to a net profit amount that is determined by using the short-term capital gains on O'Brien's tax returns (again without meaningful explanation for why that is an appropriate reference point) and applying almost $3

17

SPA-18

million in reductions that are summarily justified.  Using this method, O'Brien contends that the maximum permissible disgorgement amount is $110,909.03.

III. Procedural History

The SEC filed this action on November 18, 2021, asserting three claims: (1) violations of §§ 17(a)(1) and (3) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77q(a)(1), (3); (2) violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a), (c); and (3) violations of Exchange Act § 9(a)(2), 15 U.S.C. § 78i(a)(2).  O'Brien timely filed an answer to the complaint on February 4, 2022.

On November 3, after discovery, O'Brien filed a motion for summary judgment.  The following day, the plaintiff filed a cross motion for summary judgment.  On January 6, 2023, both motions were denied, and trial was set to commence on March 13.

On February 3, the parties filed a letter noting that they had reached a partial settlement that would resolve the non-monetary relief sought in the case.  The letter included a proposed partial consent judgment (the "Judgment"), the defendant's written consent to that Judgment (the "Consent"),

and a stipulation.  Also on February 3, the Court entered the

Judgment.  The Judgment ordered, in pertinent part that

> [u]pon motion of the Commission, the Court shall
> determine whether it is appropriate to order
> disgorgement of ill-gotten gains and/or a civil
> penalty pursuant to Section 20(D) of the Securities
> Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the
> Exchange Act [15 U.S.C. § 78u(d)(3)] and, if so, the
> amount(s) of the disgorgement and/or civil penalty.
> If disgorgement is ordered, Defendant shall pay
> prejudgment interest thereon, calculated from June 1,
> 2021, based on the rate of interest used by the
> Internal Revenue Service for the underpayment of
> federal income tax as set forth in 26 U.S.C.
> § 6621(a)(2).  In connection with the Commission's
> motion for disgorgement and/or civil penalties, for
> and at any hearing held on such a motion: (a)
> Defendant will be precluded from arguing that he did
> not violate the federal securities laws as alleged in
> the Complaint; (b) Defendant may not challenge the
> validity of the Consent or this Judgment; (c) solely
> for the purposes of such motion, the allegations of
> the Complaint shall be accepted as and deemed true by
> the Court except with respect to the quantum of
> disgorgement, i.e., net profits; and (d) the Court may
> determine the issues raised in the motion on the basis
> of affidavits, declarations, excerpts of sworn
> deposition or investigative testimony, the sworn
> testimony of the Defendant before the Court (subject
> to cross-examination by the Plaintiff) and documentary
> evidence, without regard to the standards for summary
> judgment contained in Rule 56(c) of the Federal Rules
> of Civil Procedure.

(Emphases added.)

The Consent provided, inter alia, that the Defendant

"waives the entry of findings of fact and conclusions of law

pursuant to Rule 52 of the Federal Rules of Civil Procedure" and

"waives the right, if any, to a jury trial and to appeal from

the entry of the Judgment."  In the Consent, the defendant also
agreed that he

> (i) will not take any action or make or permit to be
> made any public statement denying, directly or
> indirectly, any allegation in the complaint or
> creating the impression that the complaint is without
> factual basis; (ii) will not make or permit to be made
> any public statement to the effect that Defendant does
> not admit the allegations of the complaint, or that
> this Consent contains no admission of the allegations,
> without also stating that the Defendant does not deny
> the allegations; [and] (iii) upon the filing of this
> Consent, Defendant hereby withdraws any papers filed
> in this action to the extent that they deny any
> allegation in the complaint.

(Emphases added.)  The Consent is "incorporated into the
Judgement with the same force and effect as if fully set forth
therein."

On March 17, the SEC filed a motion for monetary relief in
the form of disgorgement, prejudgment interest, and civil
penalties.  On March 29, the defendant submitted a letter
indicating his intent to offer his own testimony.  Accordingly,
pursuant to this Court's individual practices for non-jury
trials, the defendant was ordered to file an affidavit
containing his direct testimony and the plaintiff was ordered to
indicate, subsequent to the filing of the affidavit, whether it
intended to cross examine the defendant.

On April 6, the defendant filed his papers in opposition to
the motion for monetary relief, including an affidavit

**SPA-21**

containing his direct testimony.  On April 11, the SEC moved to strike almost all of the direct testimony as in violation of the Consent.  The Court advised the parties that it intended to enforce the defendant's February 3 Consent, but denied the motion to strike on April 18.  That same day, the SEC indicated its intent to cross examine the defendant.

The defendant appeared for cross examination on May 19. After the defendant's testimony, both parties presented oral argument on the motion for monetary relief.

## Discussion

I.  Disgorgement

A.  Liability

O'Brien's liability under the relevant provisions of the securities laws is addressed first.  The complaint brings market manipulation claims against O'Brien under §§ 9(a)(2) and 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder, as well as claims under §§ 17(a)(1) and (3) of the Securities Act.

Section 10(b) of the Exchange Act states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange --

. . .

21

(b) To use or employ, in connection with the purchase
or sale of any security registered on a national
securities exchange or any security not so registered,
or any securities-based swap agreement <u>any
manipulative or deceptive device or contrivance</u> in
contravention of such rules and regulations as the
Commission may prescribe as necessary or appropriate
in the public interest or for the protection of
investors.

15 U.S.C. § 78j(b) (emphasis added).  Rule 10b-5, in turn,

provides in pertinent part:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumentality
of interstate commerce, or of the mails or of any
facility of any national securities exchange,

(a) To employ <u>any device, scheme, or artifice to
defraud</u>,

. . .

(c) To engage in <u>any act, practice, or course of
business which operates or would operate as a fraud or
deceit</u> upon any person,

in connection with the purchase or sale of any
security.

17 C.F.R. § 240.10b-5 (emphases added).  A violation of § 10(b)

and Rule 10b-5 may be premised on a defendant's use of a

fraudulent device, with scienter, in connection with the

purchase or sale of securities.  <u>SEC v. Pentagon Cap. Mgmt. PLC</u>,

725 F.3d 279, 285 (2d Cir. 2013).

Section 10(b) prohibits "manipulative acts."  <u>Set Cap. LLC

v. Credit Suisse Grp. AG</u>, 996 F.3d 64, 76 (2d Cir. 2021)

SPA-23

(citation omitted).   In the context of the securities laws, the term manipulative

> refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity, and connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.

Id. (citation omitted).   Trading that is "engineered to stimulate" supply or demand and that tricks investors into trading based on mistaken beliefs about the market may constitute manipulative activity if the alleged manipulator "injected inaccurate information into the marketplace or created a false impression of supply and demand for a security for the purpose of artificially depressing or inflating the price of the security." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 101 (2d Cir. 2007) (citation omitted).   Whether activity artificially affects a security's price generally depends on "whether the transaction or series of transactions sends a false pricing signal to the market or otherwise distorts estimates of the underlying economic value of the securities traded." Set Cap. LLC, 996 F.3d at 76 (citation omitted).

Liability under § 10(b) and Rule 10b-5 also requires proof of scienter, which the Supreme Court has defined as an "intent to deceive, manipulate or defraud" or "knowing or intentional

23

misconduct." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194

n.12, 197 (1976).  The requisite scienter "may be established

through a showing of reckless disregard for the truth, that is,

conduct which is highly unreasonable and which represents an

extreme departure from the standards of ordinary care." SEC v.

Sourlis, 851 F.3d 139, 144 (2d Cir. 2016) (citation omitted).

Mere negligence, however, is insufficient.  SEC v. Obus, 693

F.3d 276, 286 (2d Cir. 2012).  Proof of scienter "need not be

direct, but may be a matter of inference from circumstantial

evidence." Valicenti Advisory Servs., Inc. v. SEC, 198 F.3d 62,

65 (2d Cir. 1999) (citation omitted).

Section 17(a) of the Securities Act is similar to § 10(b)

of the Exchange Act and Rule 10b-5.  Section 17(a) provides:

It shall be unlawful for any person in the offer or
sale of any securities (including security-based
swaps) or any security-based swap agreement . . . by
the use of any means or instruments of transportation
or communication in interstate commerce or by use of
the mails, directly or indirectly --

(1) to employ any device, scheme, or artifice to
defraud; or

. . .

(3) to engage in any transaction, practice, or course
of business which operates or would operate as a fraud
or deceit upon the purchaser.

15 U.S.C. § 77q (emphases added).  The requirements for a

violation of § 17(a) apply only to a sale of securities, but, to

the extent relevant here, are otherwise "the same as Section

SPA-25

10(b) and Rule 10b-5." Pentagon Cap. Mgmt. PLC, 725 F.3d at
285.

> Finally, § 9(a)(2) of the Exchange Act provides:

> It shall be unlawful for any person, directly or
> indirectly, by the use of the mails or any means or
> instrumentality of interstate commerce, or of any
> facility of any national securities exchange, or for
> any member of a national securities exchange --

> . . .

> (2) To effect, alone or with 1 or more other persons,
> a series of transactions in any security registered on
> a national securities exchange, any security not so
> registered, or in connection with any security-based
> swap or security-based swap agreement with respect to
> such security creating actual or apparent active
> trading in such security, or raising or depressing the
> price of such security, for the purpose of inducing
> the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(2) (emphases added).  Section 9(a)(2) does
not proscribe all market transactions that raise or lower the
price of a security.  Chris-Craft Indus., Inc. v. Piper Aircraft
Corp., 480 F.2d 341, 383 (2d Cir. 1973).  Rather, its purpose is
to "outlaw every device used to persuade the public that
activity in a security is the reflection of a genuine demand
instead of a mirage."  Crane Co. v. Westinghouse Air Brake Co.,
419 F.2d 787, 794 (2d Cir. 1969) (citation omitted).  Proof of a
violation of § 9(a)(2) requires evidence of "manipulative motive
and willfulness," which are normally inferred from the
circumstances of the case.  Id.

SPA-26

Taking the allegations in the complaint as true, the SEC has shown that O'Brien violated §§ 9(a)(2) and 10(b) of the Exchange Act, and Rule 10b-5 thereunder, as well as § 17(a) of the Securities Act.  O'Brien engaged in an ongoing manipulative scheme to inflate and decrease artificially the prices of securities through coordinated trading events.  Using these events, O'Brien misleadingly simulated buy or sell interest in various securities, which impacted the price of those securities.  O'Brien intended to use his coordinated trading events to induce other investors to purchase or sell securities at prices that had been artificially adjusted by his activity.

Additionally, O'Brien acted with the intent to defraud and with a manipulative motive.  O'Brien designed and executed a complex manipulative trading scheme.  O'Brien was warned multiple times by brokerage firms that his activity was suspicious and could constitute a serious violation of the securities laws.  When one firm questioned him outright about whether he coordinated trading, he misleadingly avoided the question.  Indeed, he never disclosed to any firm that he engaged in coordinated trading.  When multiple firms closed his accounts after reviewing his activity, O'Brien shifted his coordinated trading to other accounts at other firms.  And, even after the SEC's investigation of O'Brien began, he continued to

engage in the same manipulative trading behavior.  Thus, there
is ample support in the factual allegations of the complaint to
show that O'Brien violated the securities as alleged.

In utter disregard of his agreement in the Judgment not to
argue that he did not violate the securities laws, O'Brien now
presents various arguments that his actions were not unlawful.
Even if O'Brien were permitted under the Judgment to make such
arguments, the arguments are meritless.  O'Brien first takes
issue with the complaint's use of the term "coordinated trading
events," arguing that the SEC has invented the term and that the
events are not a securities violation.  Contrary to O'Brien's
contentions, the term is irrelevant.  What matters is that
O'Brien's trading activity -- whatever one calls it --
artificially inflated or depressed the prices of securities and
was designed to induce investors to sell and purchase securities
at artificially impacted prices.  This, coupled with O'Brien's
scienter, is sufficient to show a violation of the securities
laws at issue.

O'Brien also argues that he did not act with the requisite
scienter.  He notes that he "testified on multiple occasions"
that he did not intend "to induce anyone to do anything."  He
also contends that the notices he received from brokerage firms
about his trading before the firms closed his accounts did not

sufficiently alert him to any suspicious trading activity and
that he "likely" did not see the notices.  But there are
sufficient factual allegations in the complaint that, taken as
true, show that O'Brien acted with the requisite intent.  The
manipulation scheme was complex and required a concerted effort
to design and execute.  In addition to the letters from the
firms, O'Brien never disclosed his coordinated trading activity
to brokerage firms, even when one firm inquired about his
strategy in general and another firm asked him directly if he
coordinated his trades.  Moreover, O'Brien placed the helper and
winner accounts at different firms to help obscure his
coordinated activity.  Additionally, O'Brien continued to engage
in the same activity after several firms closed his accounts and
the SEC commenced its investigation.[7]

Finally, O'Brien argues that because the complaint contains
only two detailed examples of coordinated trading events, those
are the only events that may support a violation.  But the
examples in the complaint are exactly that -- examples.  That
is, although the complaint contains factual allegations

---

[7] At oral argument on the motion, defense counsel suggested that
the allegations in the complaint that directly stated that
defendant acted with the relevant scienter were legal
conclusions and thus should not be taken as true.  As explained
above, however, the allegations extend far beyond mere legal
conclusions as to defendant's scienter and instead include
significant circumstantial evidence of his state of mind.

indicating that O'Brien engaged in several thousand coordinated trading events, it provides a detailed analysis of two such events.  The fact that only two events are explained in detail is not sufficient reason to disregard factual allegations -- which O'Brien agreed to accept as true for the purposes of this motion -- indicating that O'Brien engaged in roughly 18,000 coordinated trading events.  Thus, O'Brien is liable under the securities laws, and his arguments to the contrary (even setting aside that he agreed in the Judgment not to present them) are without merit.  The magnitude of O'Brien's scheme informs the decisions reached below.

B.    Disgorgement Amount

O'Brien shall disgorge $5,197,322.  "Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits."  SEC v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013) (citation omitted).  Disgorgement is "a remedy tethered to a wrongdoer's net unlawful profits."  Liu v. SEC, 140 S. Ct. 1936, 1943 (2020).  The amount of disgorgement ordered may not "exceed the gains made upon any business or investment, when both the receipts and payments are taken into the account."  Id. at 1949-50 (citation omitted).  "The district court has broad discretion

SPA-30

not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." SEC v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014) (citation omitted).

The Second Circuit applies a two-step framework for calculating equitable monetary relief. A plaintiff must first show that its calculations are a "reasonable approximation" of the amount of a defendant's unjust gains, and then the defendant may show that those figures are inaccurate. Razmilovic, 738 F.3d at 31-32. "If the disgorgement amount is generally reasonable, any risk of uncertainty about the amount falls on the wrongdoer whose illegal conduct created that uncertainty." SEC v. Fowler, 6 F.4th 255, 267 (2d Cir. 2021) (citation omitted).

The calculations of Dr. Orlov for the period of trading alleged in the complaint represent a conservative approximation of the amount of O'Brien's unjust gains. Dr. Orlov analyzed several thousand coordinated trading events, which formed the substance of O'Brien's scheme, and determined that, for the period alleged in the complaint, O'Brien received profits of $6,065,680.[8] Subtracting Dr. Orlov's estimate of commissions and fees yields a net amount of $5,197,322.

_____

[8] Although the SEC contends that disgorgement of a larger amount, based on a slightly larger period, is warranted, the parties agreed to decide this motion on the basis of the facts alleged

SPA-31

The SEC having established a reasonable approximation of the net profits from the scheme, the burden shifts to O'Brien to show that the figure is inaccurate.  O'Brien's arguments with respect to the disgorgement amount all fail.  First, O'Brien contends that disgorgement should be calculated with reference to amounts identified in his tax returns as his total short-term capital gains.  But he does not explain why these figures are an appropriate measure of his unlawful gains.  According to Dr. Orlov, O'Brien's unlawful trading activity was unusually profitable for O'Brien relative to his other trading.  Thus, the total amounts recorded as short-term capital gains on O'Brien's tax returns have likely been reduced by losses incurred in other trading, which would underestimate the gains from his coordinated trading events.

Similarly, O'Brien argues that the total amount of his net profits should be reduced by the tax rate applicable to his short-term capital gains, since he has already paid those funds to the Treasury.  This argument, too, fails.  O'Brien offers no

_____

in the complaint.  Accordingly, coordinated trading events that may have occurred beyond the time identified in the complaint are not included here.

SPA-32

authority suggesting that tax payments are relevant to the disgorgement analysis.[9]

O'Brien also proposes deducting amounts representing the trades in his Vanguard account.  According to O'Brien, it took over 30 seconds for Vanguard to process the trades in the account, which means that those trades could not have happened quickly enough to meet Dr. Orlov's definition of coordinated trading.  This misconstrues Dr. Orlov's definition of the term. Dr. Orlov's definition required that each coordinated trading event include at least one instance where O'Brien placed a winner account order that did not lag a connected helper account transaction by more than 30 seconds.  He did not, however, require that all the coordinated transactions be processed by the brokerage firms within 30 seconds.  O'Brien acknowledged at the hearing that it was possible for him to place orders for trading through his Vanguard account within 30 seconds.  Thus, O'Brien has presented no basis to conclude that the Vanguard transactions should be excluded.

---

[9] At the hearing on this motion, the defendant suggested that the Supreme Court's decision in Liu justified deducting his personal income taxes.  But Liu requires only that courts "deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)."  Liu, 140 S. Ct. at 1950.  The SEC's proposed disgorgement amount accounts for legitimate expenses in the form of commissions and fees paid by O'Brien.  Nothing in Liu states or suggests that personal income taxes must be deducted from the disgorgement amount.

SPA-33

Finally, O'Brien's remaining arguments that certain amounts should be deducted from the disgorgement calculation also fail as they lack any support. His contention, for example, that in a but-for world he would have succeeded in his trading 50% of the time is not justified with any analysis or evidence. Likewise, his use of that assumption to try to justify awarding only 7.15% of the total amount of his flawed calculation of his net profits is mystifying. Accordingly, O'Brien's arguments are without merit, and it is appropriate to order disgorgement in the amount of $5,197,322.

II.  Prejudgment Interest

"Since the primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains," district courts may "award prejudgment interest on the disgorgement amount for the period during which a defendant had the use of his illegal profits." Razmilovic, 738 F.3d at 36 (citation omitted). In determining whether to award prejudgment interest, a district court should consider

> (i) the need to fully compensate the wronged party for actual damages suffered, (ii) fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

Frommert v. Conkright, 913 F.3d 101, 109 (2d Cir. 2019) (citation omitted). These same factors also inform a court's

33

**SPA-34**

decision to use a particular interest rate, "which must not result in over-compensation to the plaintiff." Id. (citation omitted). Here, the parties agreed that, in connection with the instant motion, they would calculate any prejudgment interest using "the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)."

The parties' agreed-upon interest rate shall be applied. Prejudgment interest is appropriate in this case because O'Brien had use of his ill-gotten gains for several years and thus failing to award such interest would not adequately address the remedial purpose of the disgorgement award.

The SEC originally calculated prejudgment interest of roughly $370,547. This number was based on a disgorgement amount of $5,243,399, which was calculated based on a period of coordinated trading that extended beyond the period alleged in the complaint. At oral argument, the Court requested that the SEC provide an updated calculation based on an award calculated solely using the period alleged in the complaint. In response, the SEC filed a new calculation, but that calculation did not account for any deductions reflecting commissions and fees paid by O'Brien. Accordingly, neither of the SEC's calculations is appropriate.

**SPA-35**

O'Brien does not take issue with the method the SEC used to calculate prejudgment interest, however, nor with the time period used to determine that interest. Thus, the same method and period will be applied to the correct disgorgement amount of $5,197,322. Applying the SEC's method for calculating interest over the same period to a violation amount of $5,197,322 yields prejudgment interest of $367,291.36. Prejudgment interest in that amount is awarded.

A.   Payment to the Treasury

Disgorgement may be ordered under 15 U.S.C. § 78u(d)(5), which authorizes "any equitable relief that may be appropriate or necessary for the benefit of investors." See Liu, 140 S. Ct. at 1942-43. Because § 78u(d)(5) is limited to relief that is "appropriate or necessary for the benefit of investors," the SEC must, in general, "return a defendant's gains to wronged investors for their benefit." Liu, 140 S. Ct. at 1948. It is an open question, however, whether depositing disgorgement funds with the Treasury is justified under § 21(d)(5) "where it is infeasible to distribute the collected funds to investors." Id. Courts have held, post-Liu, that disgorgement may still be ordered even if funds need to be sent to the Treasury because it is infeasible to return funds to individual investors. See,

35

SPA-36

e.g., SEC v. Bronson, 602 F. Supp. 3d 599, 618 (S.D.N.Y. 2022) (collecting cases).

Additionally, after Liu, Congress enacted amendments to the relevant portion of the Exchange Act, suggesting that courts have greater discretion to order disgorged funds to be deposited with the Treasury.  Specifically, in 2021, Congress modified the Exchange Act to add § 78u(d)(7).  See William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4626.  That section provides that "[i]n any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."  Unlike the provision authorizing equitable relief, which was addressed in Liu, § 78u(d)(7) does not include language requiring any relief to be "for the benefit of investors."

Disbursement to the Treasury is appropriate in this case. O'Brien's scheme involved over 18,000 coordinated trading events, many of which were executed in a matter of seconds.  The investors harmed by O'Brien's activity include those who traded the relevant securities during one of the coordinated trading events.  The SEC contends, understandably, that it would be enormously difficult, if not impossible, to identify all those

SPA-37

harmed by O'Brien's activity and to disburse the disgorgement
funds to those investors.  Finally, O'Brien does not dispute
that disbursement to the Treasury is appropriate.

III. Civil Penalties

A civil penalty of $10,315,065 is imposed.  15 U.S.C.
§§ 77t(d)(2) and 78u(d)(3) allow a court to impose a civil
penalty for "each violation" of the securities laws.  Those
sections provide for three tiers of civil penalties, the most
serious of which are Tier III penalties.  Fowler, 6 F.4th at
264.  Tier III penalties may be imposed "for each . . .
violation" that involved "fraud, deceit, manipulation, or
deliberate or reckless disregard of a regulatory requirement,"
and "directly or indirectly resulted in substantial losses or
created a significant risk of substantial losses to other
persons."  15 U.S.C. §§ 77t(d)(2)(C); 78u(d)(3)(b)(iii).  The
maximum Tier III penalty is the greater of "the gross amount of
pecuniary gain to [the] defendant as a result of the violation"
or a maximum statutory amount that is adjusted for inflation.
Id. §§ 77t(d)(2)(C); 78u(d)(3)(b)(iii); Fowler, 6 F.4th at 264.
The current statutory maximum penalty for Tier III penalties for
natural persons is $223,229 per violation.  See Adjustments to
Civil Monetary Penalty Amounts, SEC Release Nos. 33-11143, 34-
96605, 2023 WL 1290981, at *2 (Jan. 6, 2023).

37

SPA-38

The term "violation" is undefined in the statute.  Courts have held that each violative trade in an overall scheme may constitute a separate violation.  See, e.g., Pentagon Cap. Mgmt. PLC, 725 F.3d at 288 n.7 (2d Cir. 2013).  Similarly, courts have defined separate violations by the separate victims of a defendant's scheme.  See, e.g., Fowler, 6 F.4th at 264–65.

Courts have discretion to determine the appropriate amount of a civil penalty "in light of the facts and circumstances." SEC v. Rajaratnam, 918 F.3d 36, 44 (2d Cir. 2019) (citation omitted).  Courts often consider several factors in making this determination, including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

Fowler, 6 F.4th at 266 (citation omitted).

O'Brien's manipulative trading scheme merits a Tier III civil penalty.  The scheme involved fraud, deceit, and manipulation and, at the very least, created a significant risk of substantial losses for investors.

A penalty of $10,315,065 falls within the maximum amount permissible under the relevant statutes.  $10,315,065 represents the gross amount O'Brien earned for the entire scheme for the

38

SPA-39

period alleged in the complaint.  Thus, even assuming that the
scheme constituted only a single violation, the "gross pecuniary
gain" from that violation represents $10,315,065.

Considering the factors relevant to the determination of
civil penalties, awarding the full amount of the defendant's
gross pecuniary gain is appropriate.  O'Brien's conduct was
egregious.  His scheme was complex, required careful planning to
execute, and consisted of over 18,000 discrete events of
coordinated trading.  Likewise, the facts showing O'Brien's
scienter are palpable.  For example, as explained further above,
O'Brien acted to conceal the coordinated trading by using
multiple accounts at different firms, disregarded the warnings
of several brokerage firms, and obfuscated their attempts to
understand his trading methods.  O'Brien's scheme also caused
substantial losses to investors as he manipulated the prices of
securities in several thousand coordinated trading events.
Similarly, far from an isolated lapse in judgment, O'Brien's
unlawful activity was recurring; the scheme lasted multiple
years and even continued after O'Brien was alerted to the SEC's
investigation.  Even after entering a Consent Judgment which
precluded him from arguing that he did not violate the law as
alleged in the SEC's complaint, he used the opportunity
presented by the process to assess disgorgement and penalties to

39

SPA-40

deny that he had engaged in any violation.  Finally, O'Brien has made no showing that his financial condition warrants reducing the penalty.  Thus, all the factors point towards imposing a penalty equal to O'Brien's gross pecuniary gain of $10,315,065.

To the extent it may be relevant, an award of $10,315,065 is not disproportionate to the amount of disgorgement.  It is a fraction of the amount permitted if the maximum fine were calculated per violation.  That calculation would amount to fine of over $4.014 billion.

O'Brien's arguments that the civil penalty should be lower largely repeat his arguments regarding his liability and the appropriate amount of disgorgement.  For the reasons identified above, those arguments are meritless.

## Conclusion

The SEC's motion for monetary relief is largely granted. O'Brien shall disgorge $5,197,322, plus prejudgment interest of $367,291.36.  Separately, civil penalties in the amount of $10,315,065 are imposed.  An Order accompanying this Opinion

SPA-41

sets a schedule for filing a proposed final judgment in this

action.

Dated:     New York, New York
           May 25, 2023

                              _____
                                   DENISE COTE
                         United States District Judge

SPA-42

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
SECURITIES AND EXCHANGE COMMISSION,     :        21cv9575(DLC)
                                        :
                         Plaintiff,     :        ORDER
           -v-                          :
                                        :
JAMES DAVID O'BRIEN,                    :
                                        :
                         Defendant.     :
                                        :
--------------------------------------- X

DENISE COTE, District Judge:

     An Opinion was issued on May 25, 2023, awarding the

plaintiff monetary relief.  It is hereby

     ORDERED that the plaintiff shall by May 31, 2023 file a

proposed final judgment.  The defendant shall by June 2, 2023

file any objections to the amount reflected in the proposed

judgment.


Dated:     New York, New York
           May 25, 2023


                              _____
                                        DENISE COTE
                              United States District Judge

SPA-43

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

            v.

JAMES DAVID O'BRIEN,

                              Defendant.

---

Civil Case. No. 21-9575 (DLC)

[~~PROPOSED~~] FINAL JUDGMENT AS TO DEFENDANT JAMES DAVID O'BRIEN

**WHEREAS,** the Securities and Exchange Commission having filed a Complaint and

Defendant James David O'Brien having: entered a general appearance; consented to the Court's

jurisdiction over Defendant and the subject matter of this action; consented to entry of a

Judgment that, *inter alia,* ordered an injunction (ECF No. 71, Judgment dated Feb. 3, 2023; ECF

No. 73, Consent of James David O'Brien); waived findings of fact and conclusions of law; and

waived any right to appeal from the Judgment;

**WHEREAS,** the Judgment further provided that, upon motion of the Commission, the

Court shall determine whether it is appropriate to order disgorgement of ill-gotten gains and/or a

civil penalty pursuant to Section 20(d) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77t(d)] and Section 21(d)(3) of the Securities Exchange Act of 1934 ("Exchange Act")

[15 U.S.C. § 78u(d)(3)] and, if so, the amount(s) of the disgorgement and/or civil penalty;

**WHEREAS,** the Commission moved for disgorgement, prejudgment interest, and civil

monetary penalties (ECF Nos. 74-78, 93);

**WHEREAS,** O'Brien filed an opposition to the Commission's motion (ECF Nos. 81-85);

SPA-44

**WHEREAS**, on May 19, 2023, the Court held a hearing on the Commission's motion for disgorgement, prejudgment interest, and civil monetary penalties, and, among other evidence, the Court considered Defendant's testimony on the witness stand and the parties' submissions;

**WHEREAS**, on May 25, 2023, the Court issued an Opinion and Order (ECF No. 93) indicating that the Court had determined to grant, in large part, the Commission's motion;

**NOW, THEREFORE**:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently restrained and enjoined from violating Securities Act Section 17(a) [15 U.S.C. §

77q(a)] in the offer or sale of any security by the use of any means or instruments of

transportation or communication in interstate commerce or by use of the mails, directly or

indirectly:

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to obtain money or property by means of any untrue statement of a material fact

or any omission of a material fact necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading;

or

(c)    to engage in any transaction, practice, or course of business which operates or

would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently restrained and enjoined from violating Section 9(a)(2) of the Exchange Act [15

U.S.C. § 78i(a)(2)], directly or indirectly, by the use of the mails or any means or instrumentality

of interstate commerce, or of any facility of any national securities exchange, to effect, alone or

with one or more other persons, a series of transactions in any security creating actual or

apparent active trading in such security, or raising or depressing the price of such security, for

the purpose of inducing the purchase or sale of such security by others.

       IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).

IV.

       IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable

for disgorgement of $5,197,322, representing net profits gained as a result of the conduct alleged

in the Complaint, together with prejudgment interest thereon in the amount of $367,291.36. The

Court finds that sending the disgorged funds to the United States Treasury, as ordered below, is

consistent with equitable principles and appropriate in this case. The Court further imposes a

civil penalty in the amount of $10,315,065 pursuant to Securities Act Section 20(d) [15 U.S.C.

§ 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]. Defendant shall satisfy

this/these obligation(s) by paying $15,879,678.36 to the Securities and Exchange Commission

within 30 days after entry of this Final Judgment.

       Defendant may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

4

Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; O'Brien as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant. The Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law, including, but not limited to, moving for civil contempt at any time after 30 days following entry of this Final Judgment. The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action.

Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 U.S.C. § 1961.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the

5

allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

Dated: _June 2_, _2023_

_____
UNITED STATES DISTRICT JUDGE